IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |
|---|---|
| MARK PANNELL,<br><br>    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION,<br><br>    Defendant. | CASE NO. 3:23-CV-00731-JJH<br><br>JUDGE JEFFREY J. HELMICK<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Mark Pannell challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On April 10, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Apr. 10, 2023). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** this matter for additional proceedings consistent with this recommendation.

PROCEDURAL BACKGROUND

Mr. Pannell filed for DIB on March 16, 2021, alleging a disability onset date of March 30, 2019. (Tr. 213). After his claim was denied initially and on reconsideration, he requested a hearing before an Administrative Law Judge. (Tr. 92-108, 136-37). Mr. Pannell (represented by counsel) and a vocational expert (VE) testified before the ALJ on March 29, 2022. (Tr. 46-90). On June 2,

2022, the ALJ found Mr. Pannell not disabled. (Tr. 14-45). The Appeals Council denied Mr.

Pannell's request for review, making the hearing decision the final decision of the Commissioner.

(Tr. 1-8; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Pannell timely filed this action on April 10,

2023. (ECF #1).

### FACTUAL BACKGROUND

### I.      Personal and Vocational Evidence

Mr. Pannell was 43 years old on his alleged onset date and 46 years old at the

administrative hearing. (Tr. 92). He attended some college but did not complete a degree. (Tr. 54).

He worked as a marketing project and account manager, client liaison, marketing associate, and

assistant manager in a retail store. (Tr. 60).

### II.     Administrative Hearing

Mr. Pannell stopped working in March 2019. (Tr. 55-56). He initially transitioned from

full- to part-time when it became difficult to sit up straight at his desk. (Tr. 56). He left voluntarily

when the company determined it required a full-time project manager. (*Id.*). He does part-time

work for the company that employs his wife, selling unused items on eBay or Facebook

Marketplace. (Tr. 74-75).

Mr. Pannell has been diagnosed with functional neurological disorder, a working diagnosis

until his doctors complete additional testing. (Tr. 63). He was recently diagnosed with motor

neuron disease, but the diagnosis has not yet been confirmed by testing. (Tr. 62, 67). He described

the following symptoms: muscle weakness, tremors, and fasciculations that affect coordination and

his ability to write; muscle weakness and loss of control in his back and core that make it difficult

to sit up in front of a computer; and problems with his legs that keep him from walking more than

short distances at a time. (Tr. 63-64). He has pain in his right leg, lower back, and core muscles. (Tr. 70). He has less pain in his upper body but has constant tightness and soreness in his right arm and hand that cause problems with coordination. (*Id.*). His most severe pain is in his facial muscles. (*Id.*). They do not sit the way they were supposed to or hold themselves up. (*Id.*). He feels as though he must fight to keep his eyes open and not drool. (Tr. 80).

Mr. Pannell believes he can work part-time but has difficulty with standing and sitting upright. (Tr. 60). He has a lot of weakness and loss of muscle control on the right side of his body and in his core muscles. (Tr. 60). His muscles are very easily fatigued and constantly feel tense. (*Id.* at 60, 78). The muscle tension is much more pronounced in cold weather, especially in his face. (Tr. 80). On exertion, his muscles feel like they are tearing. (Tr. 79). He has some difficulty with concentration and feels he cannot get words out. (Tr. 69).

Mr. Pannell can stand and walk for 10 minutes at a time each. (Tr. 71). He can sit for about 30 to 45 minutes before he can no longer hold himself upright. (Tr. 72). He can lift maybe 10 pounds without his arms quivering. (*Id.*).

On a typical day, Mr. Pannell wakes up, feeds the dog, makes coffee, and sits on the couch for a bit. (*Id.*). He relies on medication to fall asleep and usually feels exhausted on waking. (Tr. 81). On days when he feels okay, he will take the dog outside. (Tr. 73). Around mid-morning, he tries to get as much work done as he can. (*Id.*). When he feels too weak to continue, he lies down. (*Id.*). Once he feels better, he stretches or uses a massager on his leg and foot muscles or his back. (*Id.*). After that, he tries to get more work done. (*Id.*). He attempts to work about three hours a day. (*Id.*). His wife prepares all meals. (*Id.*). Mr. Pannell can perform self-hygiene tasks independently

except he requires his wife's assistance getting in and out of the shower. (Tr. 55, 73). Once he is done showering, he and his wife generally watch television until bedtime around 11 p.m. (Tr. 74).

Mr. Pannell stopped driving two years before the administrative hearing due to issues with muscle and reflex control and relies on his wife for transportation. (Tr. 55). He usually rides to the grocery store with his wife and can walk around with her for a few minutes before needing to sit down. (Tr. 74). After resting for a few minutes, he continues to walk with her. (*Id.*).

Mr. Pannell engages in exercises that help keep his muscles stretched but do not help with the feeling of weakness. (Tr. 68-69). He also tries to go for walks and, when he can manage steps, goes up and down flights of stairs for exercise. (Tr. 69). Mr. Pannell enjoys playing video games and can do so for about 15 to 20 minutes at a time before he loses dexterity in his hands and fingers. (Tr. 76). He also enjoys listening to audiobooks. (Tr. 75).

Mr. Pannell attends weekly counseling sessions. (Tr. 70). Although therapy is good for his morale, it does not help with his physical condition. (*Id.*).

The VE testified that a person of Mr. Pannell's age, education, and experience, with the functional limitations described in the ALJ's RFC determination, could perform Mr. Pannell's past relevant work. (Tr. 85). The VE also testified that employers do not tolerate an employee being off task for 25% of the workday or being absent from work two or more days a month. (Tr. 88).

## III. Relevant Medical Evidence

On March 28, 2019, Mr. Pannell met with Stephanie Cole, M.D., an ear, nose, and throat (ENT) doctor to evaluate his left ear. (Tr. 619). A recent CT scan showed a fluid-filled left mastoid space, described as stable chronic left mastoid effusion, and the issue did not resolve with antibiotics. (*Id.*at 619, 1460). Mr. Pannell complained of occasional ear pain, postnasal drip, and

4

sinus pressure and pain. (Tr. 621). Physical examination revealed edema and erythema in the left ear. (*Id.*). Dr. Cole provided ciprofloxacin-dexamethasone ear drops to treat myringitis and acute diffuse otitis externa of the left ear. (Tr. 623).

On April 9, 2019, Mr. Pannell returned to Dr. Cole's office and reported some improvement with the ear drops but continued intermittent sinus pain and pressure, headaches, postnasal drip, and congestion. (Tr. 615). Examination of his left ear revealed obstructing cerumen and debris. (Tr. 617). Once cleared, the tympanic membrane was visualized and showed mild retraction and white flecks. (*Id.*). Dr. Cole noted improvement since Mr. Pannell's last visit but discussed that attic retraction with white debris can be a sign of cholesteatoma and referred Mr. Pannell to Michael Disher, M.D., for further evaluation and possible treatment. (Tr. 618).

On May 8, 2019, Mr. Pannell met with Dr. Disher. (Tr. 610). Mr. Pannell endorsed chills, congestion, hearing loss, postnasal drip, sinus pressure, back pain, and headaches. (Tr. 612). Physical examination showed the left ear issues had subsided and did not reveal evidence of cholesteatoma or tympanic perforation. (Tr. 612-13).

On October 7, 2019, Mr. Pannell presented at the emergency department complaining of moderately severe back pain that worsened with movement, especially bending and twisting, and improved with rest. (Tr. 1441). On physical examination, Mr. Pannell had bilateral lower lumbar/upper pelvic musculature, paraspinal, and midline back tenderness without deformity, swelling, or bruising. (Tr. 1443). Straight leg raise (SLR) testing was positive bilaterally. (*Id.*). Mr. Pannell walked unassisted to the bathroom after the physical examination. (Tr. 1444). A lumbar X-ray revealed minor L5-S1 facet arthropathy. (Tr. 1443). The treating provider determined Mr.

Pannell had a lumbosacral strain and bilateral sciatica, provided prescriptions for Norco, Norflex, prednisone, and lidocaine patches, and discharged him in stable condition. (Tr. 1444-45).

A sinus CT dated December 2, 2019, revealed near complete opacification of the left mastoid air cells, similar to multiple prior studies dating back to 2015. (Tr. 1426).

On December 17, 2019, Mr. Pannell presented at the emergency department with complaints of back pain and minor bowel incontinence. (Tr. 1411). On examination, Mr. Pannell had normal range of motion with tenderness in the lower thoracic/upper lumbar spine. (Tr. 1414). CT scans showed a broad-based central and left paracentral disc protrusion at L5-S1 causing mild mass effect on the thecal sac and the left S1 nerve root was displaced posteriorly. (Tr. 1415). The treating provider determined Mr. Pannell had a herniated lumbar disc and discharged him in stable condition. (Tr. 1416).

On December 20, 2019, Mr. Pannell returned to Dr. Cole's office for evaluation of the left mastoid. (Tr. 523). He reported pain behind the left ear, intermittent vertigo that occurs when he has a headache, and overall worsening balance over the last month. (*Id.*). Physical examination revealed retraction of the left tympanic membrane that Dr. Cole felt may be contributing to some his dizziness. (Tr. 526). Dr. Cole also felt Mr. Pannell may be having a variation of a migraine. (*Id.*).

On December 24, 2019, Mr. Pannell met with Lindsey Bostelman, M.D., for follow-up after his recent emergency department visit. (Tr. 307). There, he reported chronic intermittent lower back pain and some fecal incontinence, herniated disc at L5-S1, left medial knee pain, hypersensitivity over left lateral calf and foot, and left leg weakness. (*Id.*). Physical examination revealed some lower lumbar spine tenderness to palpation, tenderness to palpation of the paraspinal muscles, and minimally diminished strength in the left calf and quad muscles. (*Id.*). Dr.

Bostelman prescribed amitriptyline for pain, referred Mr. Pannell to physical therapy, and provided an intramuscular injection of Toradol. (*Id.*).

On January 14, 2020, Mr. Pannell returned to Dr. Bostelman's office and reported some upper arm weakness. (Tr. 309). He explained a provider at the University of Michigan previously diagnosed him with benign fasciculation syndrome that did not bother him for some years. (*Id.*). Now, he complained of quivering in the forearm, bicep twitching, and arm cramping. (*Id.*). During physical therapy, he was found to have upper extremity weakness. (*Id.*). Dr. Bostelman assessed him with benign fasciculation-cramp syndrome, noted his upcoming neurology appointment at the University of Michigan, and refilled his prescription for clonazepam. (*Id.*).

On January 20, 2020, Mr. Pannell met with neurologist Douglas Gelb, M.D., at the University of Michigan. (Tr. 404). There, he described arm weakness and fatigue, cramps in the arm, chest, and shoulder, bilateral upper extremity fasciculations, and fasciculations on the left side of the face. (Tr. 405). In addition, he reported that his face feels weak when he chews or talks, he has been biting his bottom lip, inner cheeks, and tongue during meals, and his tongue feels clumsy. (*Id.*). He described drooling, mispronouncing words, and slurring his speech. (*Id.*). Mr. Pannell also reported having anxiety most of his life; he attributed many of his recent symptoms to his anxiety but was concerned that "there might be something else going on." (*Id.*). Physical examination was largely normal, except for a mild tongue tremor without fasciculations and possible fasciculations in the trunk and limbs. (Tr. 406). Otherwise, Mr. Pannell had diffusely thin muscle bulk, normal muscle tone and strength, and brisk and symmetric reflexes. (*Id.*). Dr. Gelb offered the following narrative assessment:

> Although Mr. Pannell describes many symptoms that could occur with motor neuron disease or a brainstem lesion, his neurologic examination remains essentially normal,

> whereas I would except much more impairment if he had either of those conditions
> and it had progressed enough to cause all of the symptoms he has been experiencing.
> I think it is much more likely that his symptoms are related to anxiety.

(Tr. 407). To help ease Mr. Pannell's anxiety, Dr. Gelb ordered an EMG and nerve conduction study to look for evidence of motor neuron disease and an MRI of the brain and spinal cord to look for evidence of a structural or inflammatory lesion. (*Id.*).

A CT scan of the temporal bones, dated January 28, 2020, revealed persistent complete opacification of the left mastoid air cells with possible destruction of a few of the septa of the mastoid air cells, concavity of the left tegmen mastoideum with dehiscence, thinning of the left tegmen tympani without definite dehiscence, and minimal opacification of the left middle ear without definite bone destruction or displacement of the middle ear ossicles. (Tr. 596).

On February 12, 2020, Mr. Pannell returned to Dr. Bostelman's office and complained of back pain with radiation down the legs that is worse with sitting and more pronounced memory loss, muscle fasciculations, and visual changes. (Tr. 313). He feels electrical shocks in his cheeks, rippling worm-like feelings in his legs, and electrical and burning pain in his right leg. (*Id.*). He also endorsed worsened balance, feeling exhausted, and not eating very much because he "has a hard time even getting out of bed." (Tr. 313-14). Dr. Bostelman noted Mr. Pannell looked cachectic. (Tr. 314). She refilled clonazepam and suggested Mr. Pannell speak to a dietitian about his abnormal weight loss because his neurological symptoms may stem from a lack of body fat. (Tr. 313).

On March 5, 2020, Mr. Pannell met with neurologist Noor Pirzada, M.D., for evaluation of his neurological symptoms. (Tr. 515). There, he described vision issues, including squinting to see better, trouble reading when looking straight ahead (but no trouble reading when looking

down), random shock-like jerking movements in different parts of the body, including his face and extremities, generalized burning pain, and a long-standing history of anxiety that is not always well-controlled. (Tr. 516). Physical examination was largely normal, except mildly brisk left-sided finger flexion, minimal unsteadiness during tandem walking, and action tremor when he held his hands outstretched. (Tr. 517). Dr. Pirzada noted normal results on the recent EMG and nerve conduction study and determined his symptoms were probably related to anxiety but ordered additional testing, including an EEG, to rule out organic causes. (Tr. 516-17). He also provided referrals to a neuro-ophthalmologist and a movement disorder clinic and a prescription for gabapentin to address Mr. Pannell's generalized pain. (Tr. 517).

On March 27, 2020, Dr. Gelb discussed the results of the brain and cervical spine MRIs ordered in January. (Tr. 387). He described the brain as normal and noted some degenerative changes in the cervical spine that do not explain Mr. Pannell's symptoms. (*Id.*). Dr. Gelb noted Mr. Pannell's vitamin B12 deficiency that could be contributing to Mr. Pannell's symptoms; Dr. Gelb suggested taking lifelong B12 supplementation. (Tr. 388).

On March 28 and April 4, 2020, Mr. Pannell received B12 injections. (Tr. 315-16). At this time, Mr. Pannell endorsed taking clonazepam, Viibryd, Ambien as needed, and escitalopram oxalate. (*Id.*).

On April 2, 2020, Mr. Pannell presented for a telehealth session with Talal Derani, M.D. for evaluation of visual disturbances. (Tr. 585). Neurological examination revealed intact cranial nerves but mild high frequency low amplitude postural tremors in the upper extremities, more prominent on the right. (Tr. 586). Dr. Derani felt the tremor was likely an enhanced physiologic

tremor but started Mr. Pannell on low dose propranolol to address a potential essential tremor, and prescribed magnesium oxide for muscle cramping. (Tr. 587).

On April 8, 2020, Mr. Pannell presented to the emergency department with complaints of right leg spasms, sharp pain and weakness in the right arm, visual issues, and cognitive issues. (Tr. 573). He endorsed difficulty with remembering things, some tremors in the bilateral upper and lower extremities for which he recently received a prescription for propranolol, and intermittent jerking in his extremities when he lies still. (Tr. 574). Other than a noticeable action tremor when lifting his arms and legs, some sudden jerking in his right leg lasting a few seconds, and mild dysdiadochokinesia on rapid alternating movements of the right arm, physical examination was normal. (Tr. 580-81). After basic labs returned normal, Mr. Pannell was discharged. (Tr. 576-77).

On April 17, 2020, Mr. Pannell presented for a telehealth session with Dr. Bostelman and complained of worsening symptoms, including increasing leg weakness, light sensitivity, confusion, and difficulty swallowing. (Tr. 317). Dr. Bostelman noted Mr. Pannell appeared lying in bed, disheveled, and was barely speaking or making eye contact. (*Id.*). His voice was strained, he kept his eyes shut for most of the session, and his wife did most of the talking. (*Id.*). Dr. Bostelman suggested going to Flower Emergency Room because Flower Hospital has neurology and psychiatry services. (*Id.*). At the hospital, physical examination revealed hyperreflexia in the upper and lower extremities with 10+ of clonus bilaterally and abnormal extraocular movements in the form of opsoclonus with fluttering eyelids. (Tr. 570). He was discharged in stable condition. (Tr. 571).

On April 24, 2020, Mr. Pannell returned to Dr. Bostelman's office for follow-up after his emergency room visit. (Tr. 320). Dr. Bostelman assessed situational anxiety and noted Mr. Pannell "is in a very difficult situation in which he is searching for a pathological reason for his symptoms,

but at the same time, aware that this might all be functional." (*Id.*). Dr. Bostelman discussed that they should start looking at what he can do despite his symptoms and suggested starting chair yoga to work on strength and balance. (*Id.*).

An EEG performed on April 28, 2020 was abnormal due to asymmetric posterior driving responses during photic stimulation, suggesting association with localized structural or functional lesions. (Tr. 518). That same day, Mr. Pannell presented for a telehealth session with Dr. Bostelman and complained of lower back pain with bowel and bladder issues. (Tr. 322). There, he described a recent leg spasm resulting in numbness in his lower leg and issues with incontinence. (*Id.*). Dr. Bostelman determined the symptoms could be a strain in the lumbar muscles. (*Id.*). Mr. Pannell also met with neurologist Mehmood Rashid, M.D., and complained of worsening cognitive and visual issues and involuntary movements. (Tr. 562). He endorsed long- and short-term memory issues, jumbling words and feeling confused, tremors associated with preceding abnormal sensation, daily headaches that can last hours, and sleep issues. (*Id.*). Mr. Pannell also reported an earlier diagnosis of functional neurologic disorder but remained worried that something else was also going on. (Tr. 563). Physical examination revealed normal attention span and concentration, mild intermittent stuttering, slight bradykinesia in the right arm, mild postural tremors in the upper extremities but more prominent on the right side, and a wide-based gait with decreased arm swing on the right side. (Tr. 564-65). Dr. Rashid noted some symptoms were suggestive of a functional neurologic disorder. (Tr. 565). He counseled Mr. Pannell that about one-third of patients with functional neurologic disorders see good improvement in symptoms and recommended aggressive physical therapy. (*Id.*). Dr. Rashid also referred Mr. Pannell to a psychiatrist for management of his anxiety. (*Id.*).

11

On May 2, 9, and 16, 2020, Mr. Pannell received vitamin B12 injections. (Tr. 323-25).

On May 2, 2020, Mr. Pannell went to the emergency department and complained of lower left leg numbness and heaviness and incontinence. (Tr. 1398). Physical examination revealed diminished sensation over the left lateral lower leg and lateral aspect of the left foot, hyperreflexia at the left patella, and decreased motor function, especially with plantar and dorsiflexion on the left. (Tr. 1400). The emergency department was not equipped to perform an MRI at the time and offered to transfer Mr. Pannell to a different hospital by ambulance. (*Id.*). Mr. Pannell refused, preferring to take private transportation, and left against medical advice. (*Id.*). He presented at another hospital for MRI. (Tr. 1380). Physical examination revealed lower left extremity weakness, full body clonus/tremor, decreased sensation in the left leg, and diminished dorsiflexion at the left ankle. (Tr. 1383). Mr. Pannell ambulated with an antalgic gait without foot drop. (*Id.*). An MRI of the lumbar spine showed development of a left paracentral disc extrusion at L5-S1 resulting in severe effacement of the left lateral recess and marked mass effect upon the left S1 nerve roots. (Tr. 1392). The MRI findings explained Mr. Pannell's numbness but not his incontinence. (*Id.*). Thoracic MRI was normal. (Tr. 1395).

On May 26, 2020, Mr. Pannell presented at University of Michigan's emergency department and complained of progressively worsening symptoms, including cognitive problems, vision problems, difficulty swallowing, difficulty with speech, facial weakness, fatigue, and left leg weakness. (Tr. 408). He endorsed bowel and bladder incontinence, intermittent throbbing headaches, weak abdominal muscles, wrist pain, shortness of breath when lying down, abdominal pain radiating to the testicles that worsens when eating, and pain and numbness in his feet "to the point where he has been unable to walk." (*Id.*). Physical examination revealed tenderness in the

distal ulna and fifth metacarpal of the right arm, diffuse tenderness to palpation of all toes, decreased sensation in the left dorsal foot, and mild weakness against resistance diffusely at the bilateral shoulders, elbows, grips, hips, knees, and ankles. (Tr. 411-12). Gait testing did not occur because Mr. Pannell could not ambulate. (Tr. 412). Due to his inability to walk, he was admitted for physical therapy, occupational therapy, and safety evaluations in the morning. (Tr. 413). On discharge the following day, he was advised to start physical therapy to improve mobility and conditioning. (Tr. 435).

On June 4, 2020, Mr. Pannell met with neurosurgeon Jason Schroeder, M.D., for evaluation of his lumbar spine. (Tr. 508). Dr. Schroeder noted Mr. Pannell had a very thin build and was somewhat subdued. (Tr. 511). Upper and lower extremity strength testing revealed diffuse weakness and decreased sensation in the perineum, arms, and legs. (*Id.*). Dr. Schroeder did not ask Mr. Pannell to ambulate because he was in a wheelchair. (*Id.*). Dr. Schroeder determined lumbar surgery would be of limited benefit given his complaints. (*Id.*).

On June 8, 2020, Mr. Pannell presented at a telehealth session with psychiatrist Daniel Rapport, M.D., for treatment for major depressive disorder characterized by pervasive sadness and anhedonia, psychomotor retardation, low energy, worthlessness, impaired concentration, suicidal thoughts, significant distress, and impaired functioning since November 2019. (Tr. 494-99). Mr. Pannell also endorsed symptoms of generalized anxiety disorder, including persistent excessive worry or anxiety over multiple events/activities, difficulty controlling his worries, restlessness and feeling on edge, easy fatigue, irritability, terminal insomnia, significant distress, and impaired functioning. (Tr. 496). Last, Mr. Pannell was thought to have conversion disorder characterized by altered voluntary sensory motor function findings incompatible with symptoms, significant

13

distress, and impaired functioning.[1] (*Id.*). There, Mr. Pannell recounted the history of his medical

issues as follows:

> This functional neurological problem began around last Thanksgiving. [It] started with tremors, involuntary movements and it has progressed to the point that he cannot walk. He actually does have a back problem in S1, which was causing a problem anyway but his walking problem has gotten worse. He states that he [is] also having trouble now focusing his vision and a tendency to see things even after he looks away. He feels getting confused and overwhelmed by all of this. He wonders if it is getting worse because he spends so much time in bed recently. Recently his lower legs have turned purple all the way to his knees on both sides. His PCP and his neurologist have told him that the pain from this is functional. He does not have blood clots. He has been told that he does have poor circulation in both legs. He thinks that this is a combination that some of this is real and some of this is functional. He has an appointment with a vascular surgeon today.
>
> The potential stressor that triggered all of this was that he could not find a job for 6-7 months and he had been really trying hard to find work for 3-4 months before all this started and he was feeling very hopeless.
>
> Nothing seems to make his symptoms better other than getting up but now he has literally been in bed all day. If he tries to sit up now his legs and toes start hurting and he gets lightheaded. Now he can't even get up to sit with his dog.
>
> * * *
>
> He is most bothered by his legs and feet, that he cannot stand up and walk on his own. The dizziness and difficulty seeing also bothers him. Finally, he has developed pain and strange feeling in his back and pelvis that bother him. His teeth are also bothering him. Over the last month he has stopped chewing so his wife has been feeding him nutritional smoothies that she makes 3-4 times per day. He has not been losing weight.

---

[1]     Conversion disorder, also known as functional neurological symptom disorder, is a condition where a mental health issue disrupts how the brain works and causes real, physical symptoms that a person cannot control. The symptoms occur because the brain "converts" the effects of a mental health issue into disruptions of the brain or nervous system. The symptoms are real but do not align with any recognized brain-related conditions. Cleveland Clinic, *Conversion Disorder*, http://my.clevelandclinic.org/health/diseases/17975-conversion-disorder (last visited Feb. 28, 2024).

(Tr. 497-98). During the session, Dr. Rapport noted Mr. Pannell was underweight and unshaven, appeared depressed with a congruent affect, and was lying in bed ("essentially bedridden now"). (Tr. 498). Otherwise, Mr. Pannell was cooperative and calm, maintained eye contact, was oriented and alert with intact memory, and displayed intact insight, judgment, and thought processes. (*Id.*). Dr. Rapport advised titrating off Viibryd and prescribed Lexapro, continued gabapentin and temazepam, and advised Mr. Pannell to continue with therapy. (Tr. 499).

On June 9, 2020, Mr. Pannell underwent a neuropsychological examination that was noteworthy for "considerable anxiety, mild depression, and a tendency to focus on physical functioning and health matters." (Tr. 748). The results of the evaluation suggested that his cognitive complaints are most likely attributable to those psychological issues. (*Id.*).

On June 26, 2020, Mr. Pannell met with Dr. Cole for evaluation of facial swelling, numbness, and pain. (Tr. 543). He reported trouble swallowing, eye pain, dizziness, weakness, and headaches. (Tr. 545). Dr. Cole noted Mr. Pannell was "ill-appearing and cachectic," but physical examination was largely normal. (Tr. 545-46). Dr. Cole ordered a sinus CT scan to assess for acute infection. (Tr. 547). When Dr. Cole called Mr. Pannell about the normal CT results, Mr. Pannell reported additional symptoms, including difficulty chewing and swallowing due to facial pain. (*Id.*). Dr. Cole ordered a brain MRI and a modified barium swallow test. (*Id.*).

On July 7, 2020, Mr. Pannell met with Dr. Bostelman for evaluation of postural tachycardia syndrome (POTS) and facial pain and numbness. (Tr. 333). He was very despondent, relied on his wife to answer most questions, and required her assistance with transfers. (*Id.*). Mr. Pannell had a cracked dental cavity that needed to be removed but the oral surgeon would not perform the procedure until Mr. Pannell met with a doctor about his facial pain and received

medical clearance. (*Id.*). He reported numbness in his gums radiating down his neck and pressure going up the left side of his face behind his eyes. (*Id.*). Mr. Pannell's wife was concerned for POTS and described his feet turning purple when standing for too long, spikes in heart rate when getting up from lying down, and feeling lightheaded when standing. (*Id.*). Dr. Bostelman assured Mr. Pannell he did not have an oral or sinus infection but ordered an optic nerve MRI to evaluate his pain, after which he was cleared to have the cavity removed. (*Id.*). While she felt Mr. Pannell's POTS symptoms could be explained by his extreme weight loss and deconditioning, she referred him to a cardiologist for evaluation of orthostatic tachycardia. (*Id.*). Otherwise, Dr. Bostelman noted her continued efforts to focus Mr. Pannell's attention on making improvements with physical therapy and psychiatry rather than seek more testing and specialists. (*Id.*).

That same day, Mr. Pannell presented at a telehealth session with Dr. Rapport. (Tr. 490-94). Mr. Pannell appeared disheveled with a long, unkempt beard. (Tr. 493). He kept his eyes closed for much of the session because it was "less aggravating to his face pain." (*Id.*). Thought content was obsessive, focused on physical and functional problems. (*Id.*). He was sad and constricted with impaired insight and judgment. (*Id.*). Mr. Pannell was focused on pain in his teeth and groin and continued to remain in bed during the day due to dizziness and pain. (*Id.*). He reported improvement in his tremors and muscle twitches since he has been focused on his teeth and face issues. (*Id.*). Dr. Rapport noted Mr. Pannell's thoughts were tangential and disorganized in a way that may suggest psychotic features. (Tr. 494). He would continue to monitor for conversion disorder, malingering, factitious disorder, or psychosis and prescribed aripiprazole to quiet the mind and address low energy and depression. (*Id.*).

16

On July 17, 2020, Mr. Pannell met with Andrea Bruss, M.D., for evaluation of facial tenderness and pressure as well as pain in his foot and groin. (Tr. 335). He reported several additional concerns, including face and nose tenderness, weight loss, extreme weakness to the point of being bedridden, chronic right leg and foot pain, tachycardia and lightheadedness when standing, and intermittent numbness and tingling throughout his body. (*Id.*). Physical examination revealed diminished strength equally in all extremities and positive SLR on the right side but was otherwise normal. (Tr. 336). Dr. Bruss noted Mr. Pannell needed assistance getting onto the examination table. (*Id.*).

On August 11, 2020, Mr. Pannell presented at a telehealth session with Dr. Rapport. (Tr. 485-90). There, he reported high somatic focus on his face and teeth, but his mood is improving because he is getting up and doing more. (Tr. 489). When he stays busy, as when he creates art on his phone, he does not focus on his somatic issues. (*Id.*). Mr. Pannell's self-care was better though he appeared underweight. (*Id.*). Mental status examination revealed possible somatic delusions and impaired insight. (*Id.*).

On August 24, 2020, Mr. Pannell met with Kyle Shannon, C.N.P., for evaluation. (Tr. 1105). Reviewing his medical history beginning in November 2019, he described muscle fasciculations, myoclonus in the arms and legs, spasticity in the right leg, and visual changes, causing him to remain in bed 23 hours a day. (Tr. 1105). Many of these symptoms diminished, but he developed additional symptoms in April 2020, including postural tachycardia, numbness and pain in the right calf and foot, postural dizziness and lightheadedness, burning facial pain on the left side of the face, and pain above the left eye, into the ear region, and down into the jaw line. (Tr. 1105-06). The pain is exacerbated by chewing, talking, and light touch. (Tr. 1106). Mr. Pannell

also endorsed dryness in the mouth and eyes, difficulty swallowing food, and groin pain with muscle cramping from the right testicle to lower abdomen. (*Id.*). On examination, NP Shannon noted Mr. Pannell was alert and oriented, lucid and organized in conversation, and could provide a detailed medical history. (Tr. 1107). Physical examination was largely normal except decreased sensation on the left side of his face, acrocyanosis of the right foot with increased sensitivity to light touch and pinprick, and decreased sensation in the left foot. (Tr. 1107-08). His gait was described as "very slow and cautious." (Tr. 1108). NP Shannon ordered lab work and neurological testing and referred Mr. Pannell to a urologist and a gastroenterologist. (*Id.*).

On August 25, 2020, Mr. Pannell underwent lower extremity NCS/EMG testing with normal results. (Tr. 892-93).

On August 28, 2020, Mr. Pannell met with urologist Daniel Shoskes, M.D., for evaluation of pelvic pain, muscle spasm, and testicular pain. (Tr. 781). He presented in a wheelchair. (Tr. 782). Physical examination revealed tender lower abdominal muscles and tenderness along the inguinal canal, pain in the lower groin, and pelvic muscles that were tightly spasmed with trigger points that reproduced all pain. (Tr. 782-83). Dr. Shoskes referred Mr. Pannell for pelvic floor therapy and prescribed Uroxatral. (Tr. 783).

On September 8, 2020, Mr. Pannell met with Rebecca Wainwright, APRN, C.N.P., for evaluation of abdominal and pelvic pain. (Tr. 775). He presented in a wheelchair. (Tr. 778). He described the pain as feeling like a bruise and sensitive to touch. (Tr. 776). He endorsed a bubbling feeling in his lower abdomen and groin. (*Id.*). Mr. Pannell's wife assisted him to the examination table while he avoided putting weight on his right foot. (Tr. 778). NP Wainwright ordered

18

additional testing, referred Mr. Pannell to pain management, and advised him to seek pelvic floor therapy. (*Id.*).

On September 9, 2020, Mr. Pannell met with Anam Baig, D.O., of the Headache Center for evaluation of facial pain. (Tr. 772). He presented in a wheelchair and could transfer and take a few steps with his wife's help. (Tr. 774). On examination, Dr. Baig documented largely normal findings except a discolored and edematous right foot and decreased muscle bulk throughout. (*Id.*). Dr. Baig continued gabapentin, prescribed baclofen, and referred Mr. Pannell to the chronic pain center. (*Id.*).

On September 22, 2020, Mr. Pannell met with Shrif Costandi, M.D., for pain management. (Tr. 746). There, he described lower abdominal and groin pain that interferes with physical activity, is exacerbated by standing and walking, and is alleviated by lying in the fetal position. (*Id.*). On examination, Mr. Pannell had non-specific abdominal tenderness. (*Id.*). Dr. Costandi suggested pelvic floor therapy, continued baclofen, and advised Mr. Pannell to increase his dose of gabapentin. (Tr. 747).

On October 23, 2020, Mr. Pannell met with neurologist Luzma Cardona, M.D., and explained his disagreement with his previous diagnosis of functional movement disorder. (Tr. 750). He described jerking movements in all four limbs that impairs his daily activities. (*Id.*). Dr. Cardona referred Mr. Pannell to Dr. Yu for evaluation of movement disorder. (Tr. 751).

That same day, Mr. Pannell presented at a telehealth session with Joanne Schneider, D.N.P., of the Center for Comprehensive Pain Recovery. (Tr. 744). There, he complained of generalized pain that is worse in the face, right shoulder, neck, and feet, aggravated by weightbearing, activity, and talking. (*Id.*). She reviewed his past medical history and findings and

felt Mr. Pannell had chronic pain syndrome, atypical facial pain, generalized pain, and pain disorder associated with psychological and physical factors. (Tr. 749). DNP Schneider recommended participation in the Chronic Pain Neuro-Rehabilitation Program, an intensive outpatient program focused on helping individuals improve functioning and reduce pain. (*Id.*).

On November 4, 2020, at his fifth pelvic floor therapy session, Mr. Pannell demonstrated improvement in bowel symptoms and function and endorsed reduced abdominal pain isolated to the right lower quadrant. (Tr. 736). The physical therapist noted this is the first session in which Mr. Pannell walked into the therapy department on his own. (*Id.*). He endorsed walking and doing more each day, though he continues to have right leg symptoms and facial pain. (*Id.*). Mr. Pannell's gait was mildly antalgic with a decreased cadence, but he walked independently for 200 feet. (Tr. 737).

On December 23, 2020, Mr. Pannell presented for a telehealth session with Dr. Shoskes and reported improved lower urinary tract symptoms with Uroxatral. (Tr. 730).

On January 5, 2021, Mr. Pannell sought treatment as a new patient with internal clinician Henry Ng, M.D. (Tr. 727-29). There, he explained his diagnosis of functional neurological disorder and complained of tightness in his right calf, facial pain, and abdominal pain with digestive problems. (Tr. 727). He reported being unable to walk because his toes curled up due to calf tightness, staying curled up in a ball most days due to ongoing abdominal pain and tightness, and facial pain that interferes with his ability to chew. (*Id.*). On physical examination, Dr. Ng noted blepharospasm, perioral cyanosis, mild abdominal tenderness, mild acrocyanosis in an extremity, fine tongue fasciculations, and myoclonus with right ankle jerk. (Tr. 728). Dr. Ng assessed Mr.

Pannell with central pain syndrome and fasciculations and referred him for genome mapping. (Tr. 729).

In February 2021, Mr. Pannell began working with a nutritional therapist at Cleveland Clinic's Center for Functional Medicine. (Tr. 1813). To reduce inflammation, Ariana Florita, a registered dietitian, recommended Mr. Pannell improve the quality and adequacy of his diet by eating plant-based whole foods with a low glycemic index. (Tr. 1814).

On March 25, 2021, Mr. Pannell met with Rebecca Siders, D.O., for evaluation of right upper abdominal pain and bile reflux. (Tr. 350). Physical examination was normal except abdominal tenderness. (Tr. 353). Dr. Siders ordered bloodwork and prescribed Nexium for gastroesophageal reflux disease (GERD). (Tr. 354).

On April 23, 2021, hepatobiliary imaging revealed a calculated gallbladder ejection fraction consistent with biliary dyskinesia or chronic cholecystitis. (Tr. 940-41).

On April 28, 2021, Mr. Pannell returned to Dr. Siders's office for evaluation of worsening abdominal/groin pain and gurgling. (Tr. 2461). He described worsening pain before a bowel movement that feels better when he puts pressure on the area. (*Id.*). Dr. Siders noted Mr. Pannell was thin and slightly anxious. (Tr. 2463). On physical examination, he had tenderness in the abdominal muscles and posterior testicular discomfort on the right. (*Id.*). Dr. Siders ordered lab work, an abdominal and pelvic CT scan, and a testicular ultrasound. (Tr. 2464).

On May 14, 2021, a brain MRI revealed left-sided mastoid effusion and degenerative changes in the temporal mandibular joints, with symmetric and normal-appearing facial nerves. (Tr. 1540).

On May 25, 2021, Mr. Pannell underwent a laparoscopic cholecystectomy for chronic cholecystitis. (Tr. 965-66).

On June 8, 2021, Mr. Pannell attended the University of Michigan's Movement Disorder Clinic for evaluation of tremor. (Tr. 1163). He reported difficulty walking, tightness and weakness in his right leg, abdominal discomfort, chest weakness, difficulty remaining seated and getting up from lying down, constant muscle spasms and twitching, right arm tremor and weakness, left-sided facial pain, weakness in the lower half of the face, left eye pain, reduced sensation in the mouth. (Tr. 1164). Kara Wyant, M.D., described Mr. Pannell as appearing mildly uncomfortable. (Tr. 1167). Physical examination revealed mild fasciculations of the left abdominal oblique muscle and right bicep. (*Id.*). He was very thin, with generalized muscle atrophy and mild give-away weakness on the right side. (*Id.*). Dr. Wyant noted Mr. Pannell could rise from the chair without support, had normal posture, stood with a normal base, and ambulated slowly and favored his right leg. (*Id.*). Mr. Pannell walked on his heels, toes, and tandem without assistance. (*Id.*). Dr. Wyant determined it was "very possible that his symptoms are all related to a functional neurologic disorder," and noted Mr. Pannell was reluctant to accept that assessment. (Tr. 1168).

On July 15, 2021, Mr. Pannell met with Dr. Rashid for follow-up regarding platelet dense granule deficiency. (Tr. 2359). There, he reported bilateral lumbar pain with radiation to the groin. (Tr. 2361). Dr. Rashid ordered a lumbar MRI that was performed on July 30, 2021. (Tr. 1358, 2362). It revealed a left paracentral/lateral disc bulge at L5-S1 resulting in left lateral recess stenosis and mild left neural foraminal stenosis. (Tr. 1368). The previously demonstrated left disc extrusion had resolved. (*Id.*).

On August 19, 2021, Mr. Pannell returned to Dr. Siders, complaining of facial pain and groin pain that feels like spasming, shortness of breath when lying down, and his right side "feels like it [is not] part of his body." (Tr. 2437). On physical examination, Dr. Siders described him as thin and noted muscle atrophy in his extremities. (Tr. 2442).

On September 9, 2021, Mr. Pannell met with physical therapist Manda Nofziger for evaluation and treatment of his pelvic pain. (Tr. 2397). Ms. Nofziger found decreased tissue and muscle mobility in the surrounding right pelvic area, groin, and external pelvis floor. (Tr. 2398). He returned for treatment on September 16, 2021. (Tr. 2395).

On September 15, 2021, Mr. Pannell presented at a psychiatric telehealth session with Dr. Rapport. (Tr. 480). There, Dr. Rapport noted Mr. Pannell still worries about his health but can control his anxiety better and his depression is improving. (Tr. 482). Session notes indicate that after one year of treatment, Mr. Pannell made no improvement in relieving the symptoms of conversion disorder but made minimal improvement regarding symptoms of anxiety and depression. (*Id.*). Mr. Pannell reported trying Abilify for two weeks but stopped due to no improvement and an upset stomach. (Tr. 484). He reported feeling hopeful that pelvic floor physical therapy would improve his abdominal and pelvic floor issues. (*Id.*). Otherwise, Mr. Pannell endorsed continued foot and facial pain. (*Id.*). Mental status examination revealed intact insight, judgment, and thought processes but Mr. Pannell continued to focus on physical symptoms. (*Id.*). Dr. Rapport could not  assess motor function, but Mr. Pannell stated he was mostly bedridden and unable to walk without assistance due to weakness. (*Id.*).

Also on September 15, Mr. Pannell met with Dr. Siders and requested she complete some disability forms. (Tr. 2428). Mr. Pannell endorsed the following:

- Has not worked for two years due to concentration issues and difficulty sitting for even short periods of time.

- Can walk for 15 to 30 minutes before needing to sit or lie down.

- Has neurological issues with muscle atrophy.

- Has face weakness and pain with intermittent difficulty swallowing.

- Feels defeated and is in bed often.

- Has difficulty falling asleep and is fatigued.

- Has issues focusing his vision.

- Muscles, especially in arms, become quickly fatigued with use.

- Had pelvic floor weakness radiating into his leg muscles.

- Has abdominal tenderness and occasional nausea.

- Is easily short of breath.

- Has dizziness, numbness, and tingling.

- Has anxiety.

(Tr. 2428-29). On physical examination, Mr. Pannell had diffuse abdominal pain, pelvic pain with palpation, and lower extremity atrophy. (Tr. 2432).

On September 24, 2021, Mr. Pannell presented at a telehealth session with Angelika Erwin, M.D. at the Medical Genetics Clinic for evaluation of porphyria after a urine porphyrin test returned abnormal. (Tr. 1538-39). According to Dr. Erwin's notes, acute porphyria is "characterized by recurrent attacks of abdominal pain, nausea, constipation and can go along with generalized chronic pain, weakness, neuropathy, and fatigue. Autonomic dysregulation as well as psychiatric abnormalities have been described in patients with acute porphyria." (Tr. 1542). Mr. Pannell described his medical history of fasciculations, tremor and weakness of the right arm,

tightness and weakness of the right leg, significant core weakness, trouble chewing and swallowing, intermittent constipation and abdominal pain with some indigestion and nausea, and a functional platelet disorder. (Tr. 1539). He complained of chronic pain, headaches, double vision, problems chewing and swallowing, intermittent abdominal issues, pelvic floor dysfunction, weakness, tremors, tingling, and numbness. (Tr. 1540). Dr. Erwin noted physical examination was limited because they were meeting virtually but noted normal findings except straight fissures in his eyes. (Tr. 1541-42). Dr. Erwin stated her suspicion for underlying acute hepatic porphyria was "very low" because Mr. Pannell had only very mildly elevated porphyrin metabolites and his clinical presentation was not typical for the condition. (Tr. 1542). She recommended a repeat urine screening. (*Id.*). A genetic counselor obtained a four-generation pedigree for genetic testing purposes. (Tr. 1544).

On September 28, 2021, Mr. Pannell presented at a psychiatric telehealth session with Daniel McCarthy, M.D. (Tr. 2354). There, he reported fatigue, joint pain, weakness, numbness, depression, and anxiety, but endorsed some benefit from medications. (Tr. 2357). He was dysphoric and anxious but presented with intact insight and social judgment and could focus and sustain attention. (*Id.*).

On February 23, 2022, on referral from his primary care physician, Mr. Pannell met with Jill Kunisch, C.N.P., as a new patient and complained of progressively worsening right lower extremity pain, weakness, tightness, spasticity, and abdominal muscle weakness. (Tr. 2517). He endorsed discomfort in the lumbar spine and pelvis, mostly on the right side, that wraps around the right iliac crest and extends diffusely into the thigh and calf muscles. (*Id.*). In addition, he described right knee weakness when descending stairs. (Tr. 2517-18). Curling his right leg up into

25

a fetal position helps with the twitching sensation in his right hamstring. (Tr. 2518). His symptoms are exacerbated by lying down, walking for more than a few minutes, and going down the stairs. (*Id.*). He denied relief with baclofen, gabapentin, Cymbalta, and physical therapy. (*Id.*). Physical examination revealed abnormal range of motion in the back, including on extension, flexion, and lateral bending, a positive straight leg raise test on the right, hyperreflexia at the patella and Achilles, and abnormal gait. (Tr. 2520-21). He had tenderness to palpation of the sacroiliac joint and diminished muscle strength at the right hip flexors, quadricep, hamstrings, plantar, and dorsiflexion without muscle atrophy. (Tr. 2521-23). NP Kunisch ordered EMG testing on the right leg and arm, a lumbar MRI, and testing for the presence of West Nile virus, and encouraged Mr. Pannell to continue his current medications and remain consistent with his guided home exercise plan. (Tr. 2524).

On March 23, 2022, Mr. Pannell met with Sarah Hunter, D.N.P., for a neurological evaluation. (Tr. 2526). NP Hunter noted Mr. Pannell was alert, oriented, and showed intact memory, normal attention span, and concentration. (Tr. 2531). Physical examination revealed weakness when turning his head to the right and weakness maintaining forward and backwards head positions, bradykinesia in the right hand, mild generalized weakness greater on the right side, normal muscle bulk and tone, generalized fasciculations, and normal sensation. (Tr. 2531-32). Gait testing revealed a minimal right arm swing and intermittent steppage gait with both legs, but he could tandem walk and walk on his heels.[2] (Tr. 2532). Mr. Pannell also had poor balance, bilateral intention tremors, and bilateral fasciculations under the eyes. (*Id.*). NP Hunter diagnosed Mr.

---

[2]    Steppage gait is "a movement in which the advancing foot is lifted higher than usual so that it can clear the ground, because it cannot be dorsiflexed." *Steppage Gait,* Stedman's Medical Dictionary 359240 (Nov. 2014).

Pannell with benign fasciculation-cramp syndrome, muscle weakness, chronic right-sided low back pain with sciatica, lumbar radiculopathy, lower extremity hyperreflexia, and motor neuron disease. (Tr. 2533). NP Hunter suggested good sleep hygiene, ordered lab work, and prescribed pyridostigmine for muscle weakness. (*Id.*).

## IV.  Medical Opinions

On July 16, 2021, Mr. Pannell presented for a telehealth consultative evaluation with Carolyn Arnold, Psy.D. (Tr. 1180). Based on her interview with Mr. Pannell, Dr. Arnold offered the following functional assessment:

> The claimant can understand, remember, carry out instructions, follow a conversation, and can think abstractly and apply reason when asked to interpret proverbs. His short-term memory was intact as evidenced by accurate recall of three of three words and six of six digits forward immediately. Long-term memory was intact as evidenced by the recall of three of three words after a few minutes and the recall of a personal memory. Mental flexibility is intact as evidenced by recall of six of six numbers on Digit Span backward, spelling world both backward and forward and exhibiting a strong fund of knowledge.
>
> The claimant was able to sustain concentration and show persistence with simple tasks for a long period of time and multistep tasks for a long period of time. He was not distractible or fatigued as evidenced by the performance on the Serial 7s task. The claimant has limited social interactions, mostly with family. He reported no difficulty with social interactions in the past, a history of interacting well with co-workers and supervisors and responding adequately to workplace pressures by understanding how to get the job or project done and doing it. The claimant has adapted to limitations by remaining at home, reducing activities, and trying to stay busy. The reported plan for the future is to go back to work, socialize, get a definitive diagnosis, and feel stable again.

(Tr. 1183-84) (cleaned up).

On August 5, 2021, State agency reviewing psychologist Karla Delcour, Ph.D., reviewed Mr. Pannell's psychological and psychiatric records and concluded he is mildly impaired in his abilities to interact with others and adapt or manage himself but not impaired in his abilities to

understand, remember, or apply information and concentrate, persist, or maintain pace. (Tr. 95). On November 16, 2021, State agency reviewing psychologist Courtney Zeune, Psy.D., reviewed updated records and affirmed Dr. Delcour's opinion. (Tr. 104).

On August 25, 2021, State agency reviewing physician Steve McKee, M.D., reviewed Mr. Pannell's medical records and determined he can lift and carry 20 pounds occasionally, 10 pounds frequently; stand/walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, never climb ladders, ropes, or scaffolds, and frequently crawl. (Tr. 97). On November 30, 2021, State agency reviewing physician Lynne Torello reviewed updated records and affirmed Dr. McKee's opinion. (Tr. 106-07).

On September 15, 2021, Dr. Siders completed a medical source statement regarding Mr. Pannell's functional limitations. (Tr. 1532-33). She identified Mr. Pannell's conditions as neurologic disorder, chronic pain, fibromyalgia, and muscle atrophy. (Tr. 1532). She also identified symptoms, including abdominal pain, muscle atrophy, weight loss, fatigue, weakness, and pain. (*Id.*). As a result, Dr. Siders opined Mr. Pannell could sit for 0 to 2 hours in an 8-hour workday, stand/walk for 1 hour in an 8-hour workday, and needed to alternate between sitting and standing every 5 minutes to relieve pain. (*Id.*). Further, she determined Mr. Pannell could never lift and carry any amount of weight, push or pull with the upper and lower extremities, reach in all directions, perform gross manipulation or fine manipulation, or feel. (*Id.*). Dr. Siders indicated he must avoid temperature extremes, noise, vibration, and humidity/wetness and opined Mr. Pannell's symptoms are severe enough to constantly interfere with attention and concentration needed to perform even simple work tasks. (Tr. 1533).

28

On April 1, 2022, NP Hunter completed a medical source statement regarding Mr. Pannell's functional limitations. (Tr. 2538-39). She listed his symptoms as muscle weakness and cramps, tremors, muscle twitching, fasciculations, progressive weakness, core weakness, and ptosis. (Tr. 2538). She determined Mr. Pannell can sit up to 2 hours in an 8-hour workday, stand/walk for 1 hour in an 8-hour workday, must alternate between sitting and standing to relieve pain every 30 to 60 minutes, and must lie down to rest every 1 to 2 hours. (Tr. 2538). He can occasionally lift and carry less than 10 pounds, rarely 10 pounds, but never 20 or more pounds. (*Id.*). He can rarely push and pull using the upper extremities, never using the lower extremities. (*Id.*). Mr. Pannell can frequently feel, occasionally handle (gross manipulation), and rarely reach in all directions or finger (fine manipulation). (*Id.*). He will frequently experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks and must avoid temperature extremes, humidity and wetness, hazards, and fumes, odors, chemicals, and gases. (Tr. 2539). He requires unscheduled breaks at least every 60 minutes for 30 minutes at a time, walking breaks every 30 minutes for 5 minutes at a time, and reclining breaks at least every 60 minutes for 15 to 30 minutes at a time. (*Id.*). In addition, he would be absent from work four or more days per month. (*Id.*). Supporting her opinion, NP Hunter cited objective findings and clinical observations, including bradykinesia in the right hand, degradation of left-hand finger movements, mild generalized weakness, generalized fasciculations, unusual gait consisting of minimal right arm swing and intermittent steppage gait bilaterally, poor balance, bilateral intention tremor, and eye twitching. (*Id.*).

### STANDARD OF REVIEW

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

The ALJ issued an unfavorable decision on June 2, 2022. (Tr. 14-45). At Step One, the ALJ determined Mr. Pannell meets the insured status requirements of the Social Security Act through September 30, 2023 and has not engaged in substantial gainful activity since March 30, 2019, the alleged onset date. (Tr. 20). At Step Two, the ALJ determined Mr. Pannell had severe impairments of segmental and somatic dysfunction of the cervical region and lumbar region of the spine with stenosis; mastoid effusion at the left side of the brain; functional neurological disorder, and chronic fatigue syndrome. (*Id.*). She found GERD, hypertension, hyperlipidemia, vitamin D deficiency, myofascial pain, headaches, gallstones, acute porphyria, persistent depressive disorder, generalized anxiety disorder, and conversion disorder to be non-severe impairments. (*Id.*). At Step Three, the ALJ determined Mr. Pannell does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (Tr. 24). The ALJ reviewed Mr. Pannell's medical records, administrative hearing testimony, and medical opinions and concluded he has an RFC capable of light work and can frequently climb ramps and stairs and crawl but never climb ladders, ropes, or scaffolds. (Tr. 27). At Step Four, the ALJ determined Mr. Pannell can perform past relevant work as an assistant manager. (Tr. 35).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833

31

(6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

### DISCUSSION

Mr. Pannell brings three issues for this Court's review:

1. The ALJ did not adequately evaluate whether the plaintiff is disabled pursuant to Listing 5.08 regarding weight loss due to any digestive disorder.

2. The opinions of two treating sources were rejected without adequate articulation pursuant to 20 C.F.R. § 404.1520c.

3. The ALJ failed to adequately evaluate plaintiff's pain and symptoms pursuant to 20 C.F.R. § 404.1529.

(ECF #6 at PageID 2570).

As I explain below, Mr. Pannell's second argument is correct and warrants remand. Accordingly, because that issue alone is dispositive of Mr. Pannell's appeal, judicial economy renders it unnecessary to address his first and third arguments.

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining

relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ must explain how he considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. § 404.1520c(b)(2)-(3).

According to the regulations, "supportability" means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Supportability relates to the extent to which a medical source "Consistency" means "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be. 20 C.F.R. § 404.1520c(c)(2). The ALJ must make the reasons for the supportability and consistency analysis sufficiently clear for subsequent review to determine whether substantial evidence supports the claimant's disability determination. *Id.* "So long as the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements to survive this court's review." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 440 (6th Cir. 2012). I look to the whole document when reviewing the ALJ's decision. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014).

The ALJ addressed all medical opinions as follows:

The claimant provided a medical source statement from his treating provider in September 2021, and it was opined that the claimant could sit for two hours out of an eight hour workday; stand and walk for one hour out of an eight hour workday; would need to alternate between sitting and standing every five minutes; could never lift and carry 10 pounds; could never push and pull with the bilateral extremities; could never reach, handle, finger, or feel; that pain and other symptoms would be

severe enough to interfere with the claimant's focus and concentration constantly; that the claimant would need to avoid temperature extremes, noise, vibration, and humidity and wetness; and that the claimant was unable to work. The undersigned finds that this is not persuasive as it is inconsistent with and not supported by the claimant's treatment notes that he had full range of motion, full grip strength bilaterally, normal concentration at his consultative examination, and that the claimant works part time.

In April 2022, the claimant's treating provider opined that he could sit for two hours in an eight hour workday; would need to alternate between sitting and standing every thirty to sixty minutes; must lie down and rest every 1 to 2 hours; could occasionally lift and carry up to 10 pounds and rarely more than 10 pounds; could never push and pull with the bilateral lower extremities and rarely with the upper extremities; could rarely reach, and finger, occasionally handle and frequently feel; the pain and other symptoms would be severe enough to interfere with the claimant's focus and concentration frequently; that the claimant would need to avoid temperature extremes, hazardous machinery and heights, fumes and other environmental irritants, and humidity and wetness; and that the claimant would be absent four days or more per month. The undersigned finds this is not persuasive as it is inconsistent and unsupported by the claimant's treatment notes that he had full range of motion, full grip strength bilaterally, and normal concentration at his consultative examination, and the claimant testified that warm showers actually help, and that the claimant works part time.

The State agency medical consultants opined at the initial and reconsideration level that the claimant could perform light work except never climb ladders, ropes, or scaffolds, and frequently crawl. The undersigned finds that this is persuasive as it is consistent with and supported by that the claimant had segmental and somatic dysfunction of cervical region and lumbar region of the spine with stenosis; functional neurological disorder; and chronic fatigue syndrome and has accounted for these with the above residual functional capacity.

(Tr. 34-35).

Here, regarding Mr. Pannell's treating providers, the ALJ used the key words "inconsistent" and "not supported," but the analysis leaves much to be desired, including "a coherent explanation of [her] reasoning." *Lester v. Saul*, No. 5:20-cv-01364, 2020 WL 8093313, at \*14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021). Related to supportability, the ALJ did not, with regard to either medical opinion from Mr. Pannell's

treating providers, address the supporting explanations offered. *See Misty D. v. Comm'r of Soc. Sec.,* No. 3:20-cv-00378, 2022 WL 714233, at *4 (S.D. Ohio Mar. 10, 2022), *report and recommendation adopted,* 2022 WL 889256 (S.D. Ohio Mar. 25, 2022) (holding that the ALJ fails to follow the applicable regulations regarding medical opinion evaluation by not considering supporting explanations from in support of their medical opinions).

As described above, Dr. Siders noted Mr. Pannell's symptoms, including abdominal pain, muscle atrophy, weight loss, fatigue, weakness, and pain. NP Hunter supported her opinion with observations of bradykinesia in the right hand, degradation of left-hand finger movements, mild generalized weakness, generalized fasciculations, unusual gait consisting of minimal right arm swing and intermittent steppage gait bilaterally, poor balance, bilateral intention tremor, and eye twitching. Although the ALJ recounted some of these same abnormal findings in her summarization of the medical evidence (*see* Tr. 28-34), she did not explain why she chose to reject those findings as not supportive of the medical providers' opinions. *See Hardy v. Comm'r of Soc. Sec.,* No. 20-10918, 554 F. Supp. 3d 900, 907 (E.D. Mich. Aug. 13, 2021) (holding that where summary of the medical record included both supportive and contradictory information, it does little to explain the ALJ's reasoning or to provide sufficient rationale to a reviewing court).

The Commissioner attempts to fill the gap in the ALJ's reasoning by arguing that Mr. Pannell's medical providers gave their opinions in a check-box form and that "[t]his Court has concluded that check-box opinions are unsupported and a reason to discount a medical opinion." (ECF #9 at PageID 2621-22). The Commissioner's argument is unpersuasive and inaccurately states the Sixth Circuit's approach to check-box opinions. Rather, the Sixth Circuit has cast doubt on the usefulness of check-box forms *where the physician fails to give any explanation for the pertinent*

36

*findings. See Ellars v. Comm'r of Soc. Sec.*, 647 Fed. App'x 563, 567 (6th Cir. 2016); *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 474 (6th Cir. 2016); *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. App'x 625, 630 (6th Cir. 2016). As to Mr. Pannell, both providers offered more than opinions in check-box form; they offered explanations for their opinions. (*See* Tr. 1532-33, 2538-39). Therefore, the fact that Mr. Pannell's doctors provided their opinions in check-box form does not automatically render those opinions unsupportable and does not save the ALJ's failure to address the supportability of those opinions.

Regarding consistency, the ALJ identified some evidence that, in her view, was inconsistent with the medical providers' conclusions, including full range of motion, normal grip strength, and normal concentration. Certainly, a finding of normal concentration is directly inconsistent with the medical providers' opinions that Mr. Pannell's symptoms would interfere with his ability to concentrate. But the ALJ does not explain how evidence of full range of motion undercuts the medical providers' opinions. *See Mason v. Comm'r of Soc. Sec.*, No. 22-cv-10012, 2023 WL 2480734, at *4 (E.D. Mich. Mar. 13, 2023) (holding that where the conflict between the evidence cited by the ALJ and the medical opinion was not clear, it is incumbent on the ALJ to explain how that evidence undermined the medical providers' opinions). Both medical providers make clear that their opinions are based largely on Mr. Pannell's generalized weakness ("weakness," "progressive weakness," "core weakness," "muscle atrophy"). It is not clear, and the ALJ has not explained, how full range of motion undermines either medical provider's opinion.

Additionally, the ALJ determined Mr. Pannell's ability to work part-time is inconsistent with the medical providers' opinions. Mr. Pannell described his part-time work at the administrative hearing as selling unused business assets on online forums such as Facebook and

eBay for the company that employs his wife. (Tr. 74-75). He explained he tries to work at least three hours a day, but that time is broken up so that he can lie down when he feels too weak to hold himself upright or do stretches and massage his muscles. (Tr. 73). The ALJ does not identify specific evidence to undermine these statements and does not explain how such limited part-time work is inconsistent with the medical providers' opinions.

In some instances, the failure to apply the rules properly can be harmless error, such as where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," or where the ALJ "has met the goal of . . . the procedural safeguard of reasons." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). But neither instance exists here.

## CONCLUSION AND RECOMMENDATION

Because the ALJ failed to address the supportability of the treating provider's opinions and her analysis of consistency with other medical evidence of the record is not supported by substantial evidence, I recommend the District Court reverse the ALJ's decision and remand for additional proceedings consistent with this recommendation.

Dated: February 28, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).